GEYGAN, Trustee, et al., Appellees,

v.

QUEEN CITY GRAIN CO., Appellee; Bobb et al., Appellants.

[Cite as *Geygan v. Queen City Grain Co.* (1991), 71 Ohio App.3d 185.]

Court of Appeals of Ohio,
Fayette County.

No. CA89–11–026.

Decided Feb. 25, 1991.

*Strip, Fargo, Schulman & Hoppers Co., L.P.A., John Z. Fargo* and *Michael P. Vasco,* for appellees.

*Goodman & Goodman, Stanley Goodman* and *John Stillpass,* for appellants.

***

WILLIAM W. YOUNG, Judge.

Defendants-appellants, James and Geneva Bobb, appeal from a Fayette County Court of Common Pleas decision finding them liable as corporate directors to plaintiff-appellee, Thomas J. Geygan, trustee in bankruptcy of defendant-appellee, Queen City Grain Company.

Appellants served as president and vice-president respectively of Queen City Grain Company (hereinafter "Queen City"), which operated three grain elevators in Ohio. On May 24, 1982, the director of the Ohio Department of Agriculture (hereinafter "ODOA") filed a petition for receivership against Queen City for failure to satisfy the claims of its depositors. The appointed receivers subsequently joined with ODOA in filing a complaint alleging, *inter alia,* that despite Queen City's indebtedness, appellants engaged in imprudent grain commodity trading which registered losses exceeding $1,500,000 for the corporation.[1]

Queen City, meanwhile, filed for Chapter 7 bankruptcy protection on April 29, 1983 in the United States District Court for the Southern District of Ohio. On January 30, 1984, the trial court substituted Geygan, Queen City's trustee in bankruptcy, as plaintiff in place of the receivers.

Queen City's trial took thirteen days over a six-month period from December 16, 1985 to June 18, 1986. Following the close of Geygan's case on March 14, 1986, appellants moved for a directed verdict. The court granted the motion on two of the counts but denied the motion as to the counts pertaining to the failure to prove damages and appellants' liability to Queen City for trading losses.

On August 3, 1987, the trial court found appellants' grain speculation practice imprudent and held the business judgment rule inapplicable to the damages from those transactions. Due to the difficulty in assessing damages, however, the court ordered Geygan's statistician to compile the evidence and separate appellants' trading losses in order to reach a "realistic" damage

---

1. Appellants' writ of prohibition alleging that the trial court lacked jurisdiction to decide an action brought by a receiver appointed pursuant to R.C. 926.14(E) was denied by the Ohio Supreme Court on October 24, 1984. *Bobb v. Marchant* (1984), 14 Ohio St.3d 1, 14 OBR 1, 469 N.E.2d 847.

figure.[2] After conducting three days of hearings on the subject of damages, the court found appellants liable for $1,324,000. The court subsequently denied appellants' motion for a new trial on July 20, 1989.

Appellants appealed in a timely manner and submit the following assignments of error for review:

Assignment of Error No. 1:

"The trial court erred by finding that the Bobbs were both liable to the corporation for Mr. Bobb's actions on the commodities market."

Assignment of Error No. 2:

"The trial court erred by finding Geneva Bobb was liable for damages to the same extent as James Bobb."

Assignment of Error No. 3:

"The trial court erred by permitting the plaintiff to present additional evidence of damages after both parties had rested their cases."

Assignment of Error No. 4:

"The trial court erred by denying defendants' motion for directed verdict (motion to dismiss) for failure to prove damages and denying defendants' motion to dismiss the fourth cause of action."

Assignment of Error No. 5:

"The trial court erred in finding that the damages were proven in the amount of $1,324,000."

Assignment of Error No. 6:

"The trial court erred by not considering Mr. Ellerman's proffered testimony concerning mistakes in Dr. Baldwin's calculations."

Assignment of Error No. 7:

"The decision of the trial court was against the manifest weight of the evidence."

Assignment of Error No. 8:

"The trial court erred by allowing the receivers to file their complaint and join in as plaintiffs in this action."

Assignment of Error No. 9:

"The trial court erred by allowing Geygan to be substituted as plaintiff in this action."

---

**2.** On January 13, 1988, the Ohio Supreme Court rejected appellants' writ of prohibition and mandamus seeking to prevent the hearing. *State, ex rel. Bobb, v. Marchant* (Supreme Court case No. 87–1802).

Assignment of Error No. 10:

"The trial court erred by allowing Dr. Baldwin to testify, over objection, as to whether the defendant conducted prudent elevator management."

Assignment of Error No. 11:

"The trial court erred in allowing Dr. Baldwin to testify, over objection, to exhibits 248, 249, 250, 251, 252, 253, 256, and corrected exhibits 246 and 242 and it was error to admit said exhibits."

Assignment of Error No. 12:

"The trial court erred when it denied defendants' motion for a new trial."

The first assignment of error alleges that the business judgment rule protects appellants from liability for decisions made in the management of Queen City. It is further argued that Geygan failed to present evidence that appellants acted in bad faith in operating Queen City since the actions were taken with the intent to make a profit.

"It is well-established that a corporate officer occupies a position of trust in relation to his corporation." *Wing Leasing, Inc. v. M & B Aviation* (1988), 44 Ohio App.3d 178, 181, 542 N.E.2d 671, 676, citing *Thomas v. Matthews* (1916), 94 Ohio St. 32, 43, 113 N.E. 669, 671. As a result of this position, directors have "a fiduciary relationship to the corporation and its shareholders and are held strictly accountable and liable if the corporate funds are wasted or mismanaged * * *." *Apicella v. PAF Corp.* (1984), 17 Ohio App.3d 245, 247, 17 OBR 512, 514, 479 N.E.2d 315, 318, quoting *Ohio Drill & Tool Co. v. Johnson* (C.A.6, 1980), 625 F.2d 738, 742, 19 O.O.3d 339, 342.

The General Assembly codified a director's fiduciary duty to a corporation in R.C. 1701.59(B), which provides in pertinent part:

"A director shall perform his duties as a director * * * in good faith, in a manner he reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances."

In noting Ohio's adherence to the business judgment rule during the evaluation of a director's compliance with his duty of care, the Sixth Circuit held that the rule prevents inquiry "into the wisdom of actions taken by the directors in the absence of fraud, bad faith or abuse of discretion." *Radol v. Thomas* (C.A.6, 1985), 772 F.2d 244, 256. See *Stepak v. Schey* (1990), 51 Ohio St.3d 8, 553 N.E.2d 1072 (Holmes, J., concurring).

■ On April 26, 1982, an ODOA grain warehouse examiner cited Queen City for a violation of R.C. 926.141,[3] after he found the grain elevator "long" 346,646 bushels of corn and 327,543 bushels of soybeans.[4] This provision stipulates the practice licensed grain handlers must abide by when handling delayed price grain. In pertinent part, it authorizes licensed handlers purchasing agricultural commodities to maintain at all times any combination of the commodity, rights and property equal to ninety percent of the value of the handler's obligations in the commodity.

An ODOA inspection manager testified that the purpose behind the statute's ninety percent rule was to prevent grain handlers from speculating. According to the inspection manager, eighteen of the twenty-five Ohio grain elevators that became insolvent and forced into receivership or bankruptcy between 1968 and 1985 became insolvent as a result of speculating with delayed price grain. An ODOA grain warehouse examiner further testified that Queen City's position was the "longest" he had seen in over one thousand grain elevator examinations.

■ By violating R.C. 926.141, appellants acted in bad faith and breached their duty to Queen City. Appellants purposely speculated in grain commodities despite knowing the inherent risks involved in such a venture. Such conduct not only jeopardized Queen City's financial position, but it also subjected the farmers depositing grain in the elevators to needless risks. The business judgment rule is not applicable where a director acts in bad faith by engaging in transactions which violate statutory law. As a result, appellants' first assignment of error is overruled.

■ In their second assignment of error, appellants argue that the evidence fails to support the trial court's decision finding Geneva Bobb liable as a director. Essentially, it is alleged that Geneva's decision to entrust Queen City's day-to-day operations to her husband is protected by the business judgment rule.

According to R.C. 1701.59(B), Geneva's role as a Queen City director required her to perform her duties "in a manner [s]he reasonably believe[d] to be in or not opposed to the best interests of the corporation." At trial,

---

3. R.C. 926.141 has subsequently been amended and renumbered R.C. 926.29, effective July 1, 1983. For purposes of this appeal, however, it will be referred to as R.C. 926.141 even though the language of R.C. 926.29 is used.

4. A definition of the applicable market terms is necessary at this time. "Speculating" is the buying or selling with the expectation of profiting by fluctuations in price. "Hedging" is a safeguard measure used to counter-balance a sale or purchase by making a purchase or sale of a similar nature. To be "long" means the elevator has bought grain or contracts to purchase gain. When an elevator sells grains or contracts to deliver grain, it is considered "short."

Geneva testified she knew her husband, a Queen City director, speculated in the commodities futures market. Although unaware of the exact process involved, Geneva admitted her husband took speculative positions in order to make a profit. By possessing knowledge of another director's illegal transactions and acquiescing to such activity, Geneva acted in a manner opposed to Queen City's best interests.

We are not persuaded by Geneva's argument that her passive participation in Queen City's decision-making process precluded her from breaching her fiduciary duty to the corporation. In *Francis v. United Jersey Bank* (1981), 87 N.J. 15, 432 A.2d 814, the New Jersey Supreme Court addressed the issue of whether a corporate director could be personally liable in negligence for failing to prevent other directors from misappropriating corporation funds. The facts of that case involved an elderly and sickly director that visited the corporate office only once and paid no attention to either the corporation's affairs or her duty as a director.

Initially, the court noted that directors "are under a continuing obligation to keep informed about the activities of the corporation." *Id.*, 87 N.J. at 31, 432 A.2d at 822. The failure to keep apprised, the court reasoned, thwarts the director's ability to participate in the overall management of corporate affairs. Thus, "a director is not an ornament, but an essential component of corporate governance." *Id.*, 87 N.J. at 34, 432 A.2d at 823.

Regarding the director's inability to prevent the misappropriation, the court wrote:

"Directors may not shut their eyes to corporate misconduct and then claim that because they did not see the misconduct, they do not have a duty to look. The sentinel asleep at his post contributes nothing to the enterprise he is charged to protect. *Wilkinson v. Dodd*, 42 N.J.Eq. 234, 245 [7 A. 327] (Ch.1886), aff'd 42 N.J.Eq. 647 [9 A. 685] (E. & A.1887)." *Id.*, 87 N.J. at 31, 432 A.2d at 822.

The court's reasoning in *Francis* is equally applicable to the case at hand. As a director of Queen City, Geneva was obligated to do more than perform household-type functions and attend meetings. Further, the fact she performed these tasks does not diminish her duty to fully participate in the management of Queen City's affairs and keep apprised of its business dealings. Such a duty took on added importance in light of Queen City's previous trading losses and the amount of trust farmers placed in Queen City in holding their grain. When a director has knowledge of a fellow director's improprieties and does not act upon the information, her decision to stand idly by is not a defense. Geneva's failure to prevent her husband's speculative positions amounts to a breach of duty to Queen City unprotected by the

business judgment rule. Accordingly, we find no merit to the second assignment of error.

Under the third assignment of error, appellants contend that the trial court improperly permitted Geygan's expert witness, Dr. E. Dean Baldwin, to present additional evidence of damages after both parties had rested. The court's August 3, 1987 judgment entry instructed Dr. Baldwin "to compile the exhibits now in evidence is [*sic*] such a manner to separate speculation losses from hedging losses." The court's entry noted that the expert's business computer was better equipped to handle the voluminous evidence and calculations than the court's APPLE computer. Appellants maintain that Geygan's inability to present such evidence in the case-in-chief demonstrates a failure to prove damages.

■ A trial court has discretion in permitting a plaintiff to reopen his case to introduce additional evidence after resting his case-in-chief. *Cook v. Williams* (1952), 92 Ohio App. 277, 63 Ohio Law Abs. 101, 108 N.E.2d 232. Although the court, and not the parties, ordered the additional hearing, we find the same standard to be appropriate.

■ The record shows the court requested the additional hearing in order to credit appellants for certain hedging losses. As per its instructions prior to conducting the additional hearing, the court only heard evidence that had already been presented. The record reflects that evidence regarding Queen City's losses had been put forth in the case-in-chief. Furthermore, Dr. Baldwin's testimony served the limited function of clarifying and explaining the overwhelming amount of data the trial had amassed. Finally, the record also reflects that defense counsel cross-examined Dr. Baldwin and presented rebuttal testimony concerning his computation of damages. Under these facts, it cannot be said the trial court abused its discretion in permitting Dr. Baldwin to present additional evidence. As a result, appellants' third assignment of error is not well taken.

Appellants challenge the propriety of the trial court's ruling denying its directed verdict motion for failure to prove damages in the fourth assignment of error. It is argued that the motion should have been granted after the court's judgment entry conceded the impossibility of determining damages.

■ Civ.R. 50(A)(4) states that a trial court shall sustain a motion for a directed verdict if:

" * * * after construing the evidence most strongly in favor of the party against whom the motion is directed, [it] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party."

Where the party opposing the motion is reasonably able to make out from the evidence all essential elements of his claim, a directed verdict is inappropriate. *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896.

▮▮▮ First, the court's difficulty in ascertaining damages does not preclude the recovery of a damage award. Once a right to damages has been established, that right cannot be denied because the damages are incapable of being calculated with mathematical certainty. *Pennant Moldings, Inc. v. C & J Trucking Co.* (1983), 11 Ohio App.3d 248, 11 OBR 374, 464 N.E.2d 175; *Reeser v. Weaver Bros., Inc.* (1989), 54 Ohio App.3d 46, 560 N.E.2d 819. By making a determination on appellants' liability in its judgment entry, the trial court established that Geygan had a right to damages. Such right cannot be denied simply because the court professed difficulty in computing a damage award.

Moreover, a review of the record shows evidence of the damages which resulted from appellants' mismanagement of Queen City. In addition to Dr. Baldwin's testimony, a certified public accountant testified that appellants' trading losses caused Queen City's financial failure. The accountant further testified that Queen City's net long position during the 1981 fiscal year alone culminated in a $3.1 million dollar loss for the company. Also, a manager of futures brokerage activities for grain elevator managers testified that even if Dr. Baldwin's final results were off as much as fifty percent, Queen City would still have been in a heavily speculative position. Since reasonable minds could differ as to Geygan's failure to prove damages, the trial court properly denied the motion. Appellants' fourth assignment of error is overruled.

▮▮▮ Appellants' fifth assignment of error contends that the court's $1,324,000 damage figure is based on erroneous hypothetical assumptions. An award of damages will be upheld by an appellate court if there is competent evidence supporting the award. *Williamson Co. v. Smith* (June 28, 1985), Warren App. No. CA84–02–007, unreported, 1985 WL 8720.

▮▮▮ Dr. Baldwin testified to a reasonable certainty that Queen City's financial losses were the result of imprudent elevator management. He further testified that after studying data from Queen City's records, he used a statistically valid procedure to determine the $1,324,000 damage figure. Although Dr. Baldwin's complex calculations involved a number of variables which complicated his computations, competent evidence supports the trial court's damage award. As a result, the fifth assignment of error is overruled.

▮ The sixth assignment of error challenges the trial court's decision not to consider certain testimony by appellants' expert witness, Eugene Ellerman. During one of the additional hearings, the court permitted Ellerman to rebut Dr. Baldwin's rebuttal testimony of Ellerman's previous testimony. The court did not, however, allow Ellerman to answer questions regarding Dr. Baldwin's original damage calculations on the grounds that such testimony exceeded the scope of rebuttal.

Evid.R. 403 permits a court to exclude relevant evidence if it is a "needless presentation of cumulative evidence." An inspection of the transcript shows that on direct examination during one of the additional hearings, Ellerman testified about the errors in Dr. Baldwin's computation of damages. A proffer of Ellerman's excluded rebuttal testimony reveals that he intended to testify on the accuracy of Dr. Baldwin's calculations of Queen City's losses. Since such testimony duplicated evidence Ellerman had previously presented, the trial court properly excluded it. Thus, appellants' sixth assignment of error is overruled.

The seventh assignment of error contends that the court's decision was against the manifest weight of the evidence since the only evidence presented "was of some mythical financial kingdom made up of estimated factors applicable to generalized times, generalized inventories and generalized conclusions."

▮ An appellate court should not substitute its judgment for that of the trial court where competent, credible evidence supports the trial court's judgment. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578; *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273.

▮ Despite appellants' contentions to the contrary, ample evidence supports the trial court's finding that appellants' mismanagement culminated in losses for Queen City. A certified public accountant testified that based upon his examination of Queen City's records and documents, the corporation's commodities trading losses caused its financial failure. Furthermore, Dr. Baldwin opined that based upon his examination of Queen City's records, appellants' trading practices constituted speculation. The records Dr. Baldwin used in reaching his opinion included Queen City's accounting records, sales contracts and price ledgers. Since competent, credible evidence supports the trial court's judgment, we overrule appellants' seventh assignment of error.

▮ In the eighth assignment of error it is argued that the receivers have no standing to assert claims against appellants. The receivers were appointed

after ODOA filed a petition for receivership with the court. Appellants argue that receivers established under R.C. 926.14(E) are a special statutory entity with no authority to pursue claims against individuals such as appellants.

According to R.C. 926.14(E):

"If during or after the audit or other investigation provided for in this section, or at any other time, the director has evidence that the licensed handler is insolvent or is unable to satisfy the claims of all depositors, the director may petition the court of common pleas for the appointment of a receiver to operate or liquidate the business of the licensed handler."

In *Bobb v. Marchant* (1984), 14 Ohio St.3d 1, 14 OBR 1, 469 N.E.2d 847, the Ohio Supreme Court held that the provisions of R.C. Chapter 2735 and R.C. 926.14 are *in pari materia*. Specifically, R.C. 2735.04 states that:

"Under the control of the court which appointed him * * *, a receiver may bring and defend actions in his own name as receiver, take and keep possession of property, receive rents, collect, compound for, and compromise demands, make transfers, and generally do such acts respecting the property as the court authorizes."

A plain reading of the above statute fails to place any limitations on the ability of ODOA-appointed receivers to pursue claims against individuals as appellants suggest. Furthermore, as the supreme court noted in *Bobb, supra,* at 3, 14 OBR at 3, 469 N.E.2d at 849:

"Appellants' averment that the receivers * * * have no authority to sue the officers of Queen City Grain Company is laid to rest by R.C. 2735.04, which provides, *inter alia*, that 'a receiver may bring and defend actions in his own name as receiver * * *.' "

Thus, we find that the receivers instituted this action against appellants as a proper exercise of their authority. As a result, the eighth assignment of error is not well taken.

 Appellants' ninth assignment of error maintains that the court improperly substituted Geygan as plaintiff in place of the receivers. Such a move, appellants argue, made Geygan both plaintiff and defendant due to his role as trustee of Queen City's estate.

Section 323(a), Title 11, U.S.Code, states that a bankruptcy trustee is the representative of the estate. Section 323(b), Title 11, U.S.Code gives the trustees the capacity to sue and be sued. Under this capacity, the trustee is not the agent of the debtor but rather manages the estate's funds for the benefit of the estate's creditors. *In re Obie Elie Wrecking Co.* (N.D.Ohio 1983), 35 B.R. 114.

Geygan was substituted as plaintiff after the receivers instituted this action against appellants for breaching their duty to Queen City. In this role, Geygan represented Queen City's estate as it sought to recoup funds which appellants had mismanaged. Thus, appellants were the defendants and not Queen City as appellants suggest. Since Geygan properly pursued this action in his capacity as bankruptcy trustee, we find no merit to the ninth assignment of error.

Appellants contest the court's decision to allow Dr. Baldwin to testify about prudent grain elevator management in the tenth assignment of error. It is alleged that the facts forming the basis of Dr. Baldwin's opinion are not in evidence.

Evid.R. 703 governs opinion testimony of expert witnesses and states that:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

Thus, opinion testimony by an expert witness must be based upon facts within the witness' own personal knowledge or upon facts shown by other evidence. *State v. Jones* (1984), 9 Ohio St.3d 123, 9 OBR 347, 459 N.E.2d 526; *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317; *Price v. Daugherty* (1982), 5 Ohio App.3d 157, 5 OBR 339, 450 N.E.2d 296.

A review of the transcript reveals that two of Geygan's exhibits, which contained a total of one hundred twenty "overheads" were admitted into evidence.[5] Specifically, overhead number 28 contained a list of the records Dr. Baldwin used in analyzing Queen City's daily position report from June 1979 to May 1982.[6] Among those records listed were Queen City's shipping invoices, price ledgers, accounting records, sales contracts from two of Queen City's divisions, and the Garvey Commodity reports. Furthermore, Dr. Baldwin testified that he used these records to reach his opinion on Queen City's financial situation.

As Dr. Baldwin's opinion was within the provisions of Evid.R. 703, we find no merit to the tenth assignment of error.

Taken together, appellants' eleventh and twelfth assignments of error argue that the trial court erred in denying appellants' motion for a new trial since Dr. Baldwin's testimony at the additional hearings constituted a surprise

---

5. Apparently, during the trial, Geygan displayed exhibits via an overhead projector.

6. A daily position report is an accounting device used by grain elevators to determine grain balance.

under Civ.R. 59(A)(3). Specifically, appellants contend that Geygan violated Civ.R. 26(E)(1) by failing to supply them with the documents used by Dr. Baldwin during the hearings.

In pertinent part, Civ.R. 59(A)(3) allows a new trial to be granted upon " * * * surprise which ordinary prudence could not have guarded against." Additionally, the trial court is vested with broad discretion in determining whether to order a new trial. *Jones v. Meinking* (1987), 40 Ohio App.3d 45, 531 N.E.2d 728.

Appellants' argument proceeds on the assumption that Geygan's failure to supplement the answers to appellants' request for production amounted to surprise under Civ.R. 26(E)(1). Civ.R. 26(E)(1) provides that a party is under no duty to supplement a response to a discovery request to include after-acquired information if the response was complete when made except that:

"(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify."

We find Geygan was under no duty to supplement his response after the court ordered his expert witness to testify at the additional hearings. As noted earlier, Dr. Baldwin's testimony consisted of evidence which had previously been presented to the court. As such, it can not be classified as "after-acquired" information. Furthermore, the court conducted the first additional hearing one year after informing both parties of its decision to have Dr. Baldwin compile the data. Thus, appellants not only had ample time to prepare for Dr. Baldwin's testimony, but were well aware of its subject matter as well. Since Dr. Baldwin's testimony did not amount to a surprise, the trial court properly rejected appellants' motion for a new trial. Accordingly, the eleventh and twelfth assignments of error are overruled.

*Judgment affirmed.*

JONES, P.J., and KOEHLER, J., concur.